**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------X

**JANE DOE 1, JANE DOE 2, and**    :   Civil Case No.: 23-cv-10117
**JANE DOE 3,**    :
    :
   Plaintiffs,    :
    :
  v.    :
    :   **COMPLAINT**
**PALPUNG THUBTEN CHÖLING, f/k/a**  :
**KAGYU THUBTEN CHÖLING,**    :   **DEMAND FOR A JURY TRIAL**
    :
   Defendant.    :
    :
    :
------------------------------------------------------X

Through their attorneys, Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 ("Plaintiffs")

allege as follows against Defendant PALPUNG THUBTEN CHÖLING, f/k/a KAGYU

THUBTEN CHÖLING ("Defendant" or "KTC").

## PRELIMINARY STATEMENT

1.    Norlha Rinpoche ("Norlha"), acting as Defendant's director and leader, sexually

abused and assaulted numerous women from the 1980s to the 2010s.

2.    Plaintiffs are three women who suffered Norlha's sexual abuse over the course of

nearly three decades.  They bring federal claims pursuant to the Trafficking Victims Protection

Reauthorization Act and New York state law claims under the Adults Survivors Act, New York

Civil Practice Law and Rules section 214-j.

3.    Defendant advertised Norlha as an all-knowing leader with tremendous power.

Defendant's leaders, including long-term board members, incessantly repeated that Norlha knew

what was best for all.  Plaintiffs quickly learned they should defer to Norlha's knowledge in all matters, including where to live, where to work, and whom to associate with.  His judgment eventually replaced their own judgment about personal matters.

4.      Norlha exploited the power and prestige granted by Defendant to assault Plaintiffs with impunity.

5.      Despite prior knowledge of Norlha's history of sexually abusing young women and his ongoing abuse of Plaintiffs, Defendant's board members and leaders failed to intervene.

6.      In fact, Defendant enabled Norlha by, *inter alia*, providing him with women to sexually abuse and scheduling these non-consensual encounters.

7.      Norlha and Defendant followed a pattern.  They lured vulnerable women decades younger than Norlha to Defendant's premises, isolated them, subjected them to harsh conditions including hard labor and sleep deprivation, and manipulated them into trusting Norlha's judgment over their own, encouraging them to allow Norlha to take over all decision-making power in their lives.

8.      After this initial grooming, Norlha and Defendant then coerced the women into participating in a three-year, gender-segregated retreat on Defendant's grounds with the plan to further abuse them in an isolated setting where Norlha's power was unchallenged.  The nature of the walled-in enclosure made them entirely dependent upon Defendant and Norlha for all of their needs.

9.      On information and belief, Defendant was aware of Norlha's sexual exploitation at KTC retreats spanning decades.  On information and belief, in the early to mid-1980s, years before Plaintiffs were sexually exploited, Norlha routinely assaulted a young female student with

Defendant's knowledge.  However, despite this knowledge, Defendant stood by its leader, kept Norlha in power, and as a result, he went on to sexually assault Plaintiffs Doe 2 and Doe 3 in the late 1980s and 1990s and Doe 1 in the 2010s.

10.    Instead of protecting these vulnerable women or reporting the assaults to the police, Defendant's board members and leaders facilitated Norlha's unrestricted access to them.

11.    Defendant and its leaders benefitted from this arrangement because Norlha was the face of the organization and its prime fundraiser, so keeping him happy was to their business and personal advantage.

12.    Defendant is liable for its role in trafficking Plaintiff Jane Doe 1 to Norlha.

13.    Defendant is also culpable for its negligence and negligent retention or supervision of Norlha.

14.    Defendant knew or should have known about Norlha's abuse but did nothing to prevent it.  Rather, its leaders and board members facilitated and enabled Norlha's sexual assaults of Plaintiffs.  They provided Norlha with facilities and access to groom and abuse women, often bringing victims to him knowing that sexual abuse would occur.

15.    Defendant neglected to investigate, reprimand, supervise, or stop Norlha from sexually abusing Plaintiffs.  Instead, it retained Norlha, allowing the abuse to continue for decades.

16.    Finally, Defendant aided and abetted the breach of Norlha's fiduciary duty to Plaintiffs by, *inter alia*, promoting unquestioning obedience to Norlha's commands and participating in his abusive control.

17.    This action alleges physical, psychological and emotional injuries suffered as a result of conduct which would constitute a sexual offense as defined in Article 130 of the New

York Penal Law, including, without limitation, conduct constituting sexual misconduct (N.Y. Penal Law § 130.20); rape (N.Y. Penal Law §§ 130.25 – 130.35); forcible touching (N.Y. Penal Law § 130.52); and/or sexual abuse (N.Y. Penal Law §§ 130.55 – 130.65).

## PARTIES

18. Jane Doe 1 is an adult woman who at all times material to this complaint resided in New York state. She is currently a resident of California.

19. Jane Doe 2 is an adult woman who at all times material to this complaint resided in New York state. She is currently a resident of New York.

20. Jane Doe 3 is an adult woman who at all times material to this complaint resided in New York state. She is currently a resident of Hawaii.

21. Defendant is a not-for-profit corporation based in 245 Sheafe Road, Wappingers Falls, New York, 12590. It is a Tibetan Buddhist monastery founded in 1978 by Norlha.

22. On information and belief, at all material times, Norlha was Defendant's director and leader.

23. At all material times, Norlha was acting in his capacity as Defendant's agent and/or employee within the course and scope of his agency duties for Defendant. Norlha acted at all material times in direct connection with his agency and/or employment duties for Defendant, and within the time and space limits of his agency duties for Defendant. Norlha's grooming and abuse of Plaintiffs directly arose from the relationship he cultivated with them through his role at KTC. At all material times, Norlha held actual and apparent authority to bind Defendant.

24. Defendant was operating at all material times as Kagyu Thubten Chöling. On information and belief, since around 2018, after Norlha's death, Defendant has been operating as

Palpung Thubten Chöling.   On information and belief, this was a renaming.  In the alternative, on information and belief, Defendant was the parent company which subsumed and acquired all of Kagyu Thubten Chöling's liabilities.

25.   Defendant is an IRS-registered 501(c)(3) nonprofit organization.  On information and belief, it is also a registered charity in the state of New York.

26.   On information and belief, Defendant's board members include, *inter alia*, Susan Skolnick, Administrative Vice President; Denise Lordi, Secretary; and Shoshana Rogner, Treasurer (individually, a "Board Member," and collectively, the "Board Members").[1]   On information and belief, Skolnick, Lordi, and Rogner held these and/or other leadership positions at Defendant at all material times.

27.   Defendant actively recruits volunteers and donations nationally and internationally through, for example, its website.  Defendant has affiliated entities throughout the United States, including the District of Columbia, Florida, New Hampshire, North Carolina, Tennessee, and Virginia.  Defendant also holds meetings via Zoom which allows for participation from all over the United States and, on information and belief, the world.  Defendant's website advertising itself and its three-year retreat is available internationally.  Defendant has invited teachers from around the world to attend its events, and Defendant's teachers have traveled internationally as well.

---

[1] *Board Members*, Palpung Thubten Chöling, https://palpungny.org/lineage/board-members/ (last visited November 15, 2023); *see also Board Members*, Kagyu Thubten Chöling, https://www.kagyu.com/introduction/board-members (last visited November 15, 2023).

## JURISDICTION AND VENUE

28.    This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

29.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS

### KTC'S FOUNDING, OPERATION, AND HISTORY OF ABUSE

30.    In 1978, Norlha founded the Defendant in Wappingers Falls, New York.  The main building sits on seven acres of land overlooking the Hudson.

31.    Defendant offers meditation classes and other seminars and classes.    Students live on Defendant's grounds in living quarters.

32.    Defendant also runs a retreat center (the "Retreat Center") where students undertake a three-year retreat (the "Three-Year Retreat").

33.    The Three-Year Retreat is a program of intensive meditation practices intended for dedicated students who wish to train in KTC's core teachings and practices on Defendant's one-quarter acre fenced-in compound.

34.    In the Three-Year Retreat, women and men are sealed in separate structures at the organization's property in Wappingers Falls.

35.    Enclosed in with several other women, participants have little contact with the outside world.  During the totality of the Three-Year Retreat, they are forbidden from leaving the compound, except for extenuating circumstances.

36.    Access to the telephone and Internet are strictly prohibited, and any messages sent outside the Three-Year Retreat must be relayed through Defendant's staff.

37.    Defendant and Norlha regulated every aspect of a participant's physical reality, including access to food, medical care, and other necessities for survival.

38.    Defendant and Norlha discouraged participants from sleeping lying down.  They were usually made to pass the night seated in a wooden box.

39.    Defendant did not allow men to access the women's section of the Retreat Center; Defendant only allowed Norlha to enter, and he decided which other men could also enter. Defendant created an image of Norlha as the participants' paternal guide in the Three-Year Retreat.

40.    Participants were socially isolated from one another.  They maintained vows of silence for months and years at a time, and Defendant discouraged participants from communicating with people right in the next room.  When it came to talking, the retreat rules specified only "functional talking," and discouraged sharing any problems or difficulties.

41.    As a result, the Retreat Center was often silent.  It also had very thin walls; it was possible at any time to hear what any other participant was doing.  It was also surrounded by gravel, so that any participant could hear when someone was approaching.

42.    Mental health care was discouraged, and participants did not have access to any mental health resources, such as a psychotherapist, physician, nurse, or other neutral third party.

**PATTERN OF ABUSE**

43.    Defendant's Board Members, senior managers, donors, and other agents presented Norlha as endowed with special powers, such as clairvoyance.  They insisted that Norlha was an all-knowing altruistic person who used his omniscience only for good.

44.    Defendant maintained and advertised an image of Norlha as superior to ordinary human beings.  He sat on a throne when the group gathered in the assembly hall; otherwise, he sat in a special chair off-limits to others.  Staff served him his meals on special plates and cutlery that no one else was permitted to use.

45.    Defendant routinely urged residents including Plaintiffs to demonstrate loyalty to Norlha by various acts of subservience.  Defendant's Board Members and leadership also routinely insinuated that thriving at KTC depended on following all of Norlha's instructions.  The power Defendant invested in Norlha was absolute.

46.    Defendant's Board Members strongly encouraged residents including Plaintiffs to have Norlha personally weigh in on all their major personal decisions.  To deviate from Norlha's commands or "advice" about their personal lives and choices was to risk his wrath, ridicule, and public disparagement.

47.    Plaintiffs each arrived at KTC vulnerable and seeking guidance from Norlha.  They sought relief from the pain afflicting them.  Doe 1 had recently developed Lyme's disease and was experiencing fatigue, brain fog, and heart palpitations; Doe 2 and her long-time partner had recently ended their relationship; and Doe 3 had lost her mother and grandmother within a short period.

48.    Norlha manipulated each Plaintiff's vulnerabilities by grooming and luring them into a false sense of security.  They trusted him for guidance and support, viewing him not sexually, but as a grandfatherly figure and teacher.

49.    Norlha repeatedly employed a stratagem of overriding Plaintiffs' own direct experiences and insisting they accept his version of events.  As a result, Norlha eroded their

confidence in their own perception and judgment.  Since Defendant assured them that Norlha knew

best, Plaintiffs were instructed to trust him more than their own observations, beliefs and intuition.

50.    At KTC, it was understood and expressed that the duty of women was to serve

Norlha.  From the start, this role relegated Plaintiffs to a subordinate position.

51.    During their time at KTC, Plaintiffs gave Defendant their money, thereby

significantly increasing their dependence on Norlha and Defendant and limiting their ability to

leave.

52.    Plaintiffs were defenseless against Norlha.  They were decades younger than him

and powerless within the organization, while Norlha was exalted as a larger-than-life character to

be obeyed.  The power imbalance between them could not have been greater.

53.    Norlha abused his power by coercing the Plaintiffs into believing that sexual

intercourse with him was necessary for their own benefit.  They were reticent and did not desire

to have sexual intercourse with him; however, he wore them down over time with psychological

manipulation.  Norlha and Defendant successfully made them believe that obeying his every

command was necessary and for their own good.

54.    Norlha went to great lengths to keep the women he was abusing from knowing

about one another, including frequent deception and manipulation.

55.    Norlha's propensity for grooming and sexually abusing women was well known to

Board Members.  They, including long-serving Board Members Susan Skolnick and Shoshana

Rogner, facilitated Norlha's sexual abuse, procuring the Plaintiffs for his sexual gratification.

56.    Defendant had constructive knowledge as well.  For example, the stairs leading up

to Norlha's quarters creaked so loudly that it was obvious to anyone in the building whenever

Norlha had a visitor.  It was customary for visitors to take off their shoes before entering Norlha's

room, so the shoes left in the hallway outside his door similarly made it public knowledge precisely

who was in the room with him, and for how long.

## PLAINTIFF JANE DOE 1

### PLAINTIFF JANE DOE 1 RECRUITED TO KTC OUT OF BARD COLLEGE

57.    Plaintiff Jane Doe 1 attended Bard College from 2005 until graduating in 2009.

58.    In 2007, Doe 1's boyfriend first suggested she attend KTC with him.  He described

KTC as a community of advanced philosophy and assured her it was not a religion.  On information

and belief, Doe 1's boyfriend was lured to KTC by Bard Professor Robert Kelly.  On information

and belief, Kelly has been one of Defendant's long-standing patrons and a Board Member.

59.    In 2007, Doe 1 went to see Norlha at KTC.

60.    In spring 2009, Kelly, now Doe 1's professor, stopped Doe 1 on Bard's campus to

tell her that Norlha had asked after her.  Kelly told her it was a great honor that Norlha was taking

special interest in her.   Kelly recommended Norlha as a man of exceptional wisdom and

psychological insight.

61.    By the time Doe 1 graduated from Bard in 2009, she learned that her boyfriend

planned to enter the Three-Year Retreat, which meant secluding himself from the outside world

under Norlha's guidance.  With this decision, their relationship ended.

62.    In 2009, after graduating, Doe 1 contracted Lyme's disease and suffered from

chronic symptoms, including fatigue, brain fog, and heart palpitations.

63.    During this vulnerable time, Doe 1 contacted her ex-boyfriend and told him she

was unsure of what to do with her life.  Her Lyme's disease symptoms handicapped her search for

employment.  After he listened to her frustration and disillusionment,  he suggested that she attend a weekend retreat at KTC in the fall of 2009, and she agreed.

64.     Upon conclusion of the retreat, Norlha requested a private meeting with Doe 1. Doe 1 left the meeting inspired by the prospect of learning from someone as esteemed as Norlha.

65.     The next day, Doe 1 decided to stay at KTC to study.

## NORLHA BEGINS GROOMING DOE 1

66.     Norlha at once began showering Doe 1 with special attention.  He assigned Defendant's personnel to attend to her.  Being singled out for this treatment made her feel important and special.

67.     This special attention was plain for all to see, including Board Members Lordi, Skolnick, and Rogner.

## DOE 1 MADE FINANCIALLY AND EMOTIONALLY DEPENDENT ON DEFENDANT

68.      After hearing Defendant's Board Members and leaders incessant idolization of Norlha, Doe 1 learned quickly that she should defer to Norlha's authority on all matters.

69.     Defendant's Board Members, leadership, and Norlha himself convinced Doe 1 that following Norlha's guidance and staying at KTC was her only way to happiness.

70.     Doe 1's mother was concerned by what she heard and, in the winter of 2010, urged Doe 1 to move out from under Norlha and Defendant's sway.

71.     When Doe 1 reported her mother's advice to Norlha, he instructed her to refuse any further financial help from her mother.  He and Defendant would take care of her instead.

72.     In or around 2010, Doe 1 followed Norlha's instructions and refused support from her mother.

73.     Norlha directed Doe 1 to take a job as a doctor's receptionist in the Hudson Valley.

74.     In or around late 2010 or early 2011, Norlha ordered  Doe 1 to end her relationship with her boyfriend at the time.   Doe 1 complied.

**NORLHA BEGINS TO SEXUALLY ABUSE DOE 1**

75.     About a year into her stay at KTC in or around 2010,  Norlha called Doe 1 over and embraced her while she was serving him tea.  Doe 1 was taken aback and felt as though a boundary had been crossed.  She told herself it must have been a grandfatherly hug.  At this time, Norlha was in his seventies, and Doe 1 was in her early twenties.

76.     In or around 2010, Doe 1 was serving Norlha his breakfast in his private quarters when he began to profess his affection for her in the presence of Lordi, Defendant's longtime Board Member.  On information and belief, Lordi then served as Norlha's personal attendant.

77.     Norlha told Doe 1 that the two of them had a special connection, and he was going to give her secret teachings.  He made a show of escorting Doe 1 publicly around the grounds of KTC, announcing that this, meaning the KTC property, was all hers.

78.     Not long thereafter, Norlha entered the KTC assembly hall one evening when Doe 1 was there alone.  Wearing nothing but undergarments, Norlha bent down as if to help her stand up. Instead, he grabbed her around the waist.   Doe 1 was stunned yet again.  He hinted that this more intimate physical contact was going to continue and he swore Doe 1 to secrecy.

79.     The next evening, Lordi prevented Doe 1 from having dinner with other KTC residents.  Instead, Lordi directed  Doe 1 to cook an evening meal for Norlha and serve it to him in his quarters.

80.     Though Lordi seldom left Norlha's side, on this evening, she indicated to Doe 1 that she would be alone with Norlha in his quarters for dinner.  As Doe 1 cleared the table, Norlha grabbed her hand and commanded her to return after he went to bed.

81.     Doe 1 returned to Norlha's room as ordered after bedtime.

82.     That night in his room, Norlha inserted his flaccid penis into Doe 1's vagina.

83.     After the first sexual encounter, Defendant's representatives frequently called Doe 1 to Norlha's room where he would insert his limp penis into her vagina without a condom. It would often leak urine or bloody urine.  Unbeknownst to Doe 1 (but known to Defendant as discussed further below), Norlha had Hepatitis B, which is spread through contact with infected blood and semen.[2]  Norlha also penetrated Doe 1 digitally.  This happened dozens of times from 2010 to 2011.

84.     In early 2011, Doe 1 traveled to India per Norlha's instruction.  There, bowing to his pressure, she swore complete devotion to Norlha.

85.     At this point, Norlha had consolidated his control over every aspect of her life, physically, financially, psychologically, and now, sexually.

_____

[2] *Viral Hepatits - Hepatitis B*, Centers for Disease Control and Prevention (March 9, 2023), https://www.cdc.gov/hepatitis/hbv/index.htm.

## DOE 1 ENTERS THREE-YEAR RETREAT, NORLHA'S ABUSE CONTINUES

86.     In 2011, Doe 1 entered the Three-Year Retreat.  For the next three years, her every waking moment was regulated by Norlha and Defendant.  She was forbidden to leave the quarter-acre fenced-in compound in Wappingers Falls, New York, except under extreme circumstances.

87.     In 2013, Doe 1 served as Norlha's attendant, a privileged position.

88.     From 2013 continuing until late 2014, Norlha frequently groped Doe 1, reaching under her skirt and kissing her.  At this time, Doe 1 experienced visceral physical repulsions to Norlha's demands for sexual contact.

89.     The Three-Year Retreat ended in 2014.  As was true for other dedicated students, Doe 1 stayed at KTC to continue studying.

90.     During the months following Doe 1's exit from the Three-Year Retreat in 2014, Norlha began initiating sexual contact publicly.  On one occasion, he lifted Doe 1's skirt while she was walking along a path on KTC grounds.  On another, Norlha pinned Doe 1 against a building. Anyone passing by could have witnessed Doe 1 and Norlha.

91.     Shortly thereafter, Doe 1 told him she was uncomfortable with the sex and wanted it to stop.

92.     The next day, Norlha did not leave his room.  Word spread at KTC that he had fallen gravely ill.  For the next four to six months, he remained shut up in his quarters.

93.     Doe 1 had previously served as Norlha's personal attendant, and they had daily contact—a privileged position granted in exchange for her submitting to sex.  After she said no to him, Defendant banned Doe 1 from Norlha's presence, and she was replaced by two other women in their twenties.

**NORLHA RETALIATES AGAINST DOE 1 FOR HER NEW RELATIONSHIP**

94.    During these months that Doe 1 had no contact with Norlha, a relationship blossomed between Doe 1 and another KTC resident.  After several months, Norlha began to recover and resumed his public appearances.

95.    On February 9, 2015, Doe 1 informed Defendant's Board Member Robert Kelly and his wife Charlotte of the budding relationship.  She asked them to keep this news confidential so that she could tell Norlha herself.  That very day, Kelly informed Norlha that Doe 1 was dating.

96.    Norlha became infuriated.  When Skolnick, a longtime Board Member, came to find Doe 1, she warned her that Norlha was yelling and slamming doors, visibly angered.  Norlha screamed obscenities at Doe 1 in front of Skolnick, such as "Busy girl! Dirty girl! Big penis!"

**KTC BOARD MEMBER PRESSURES DOE 1 TO SUBMIT TO NORLHA'S SEXUAL ABUSE**

97.    After Norlha's outburst, Skolnick discussed Norlha's sexual abuse of Doe 1 with her on several occasions.

98.    Skolnick pressured her to continue submitting to Norlha's sexual abuse.  Skolnick told Doe 1 that she should continue for Norlha's health and continued life.

99.    Skolnick instructed Doe 1 not to tell her new partner.

100.   In late 2015 or early 2016, Norlha increasingly and relentlessly threatened Doe 1 with dangerous consequences should she withhold sexual contact from him.  He told Doe 1 that she would be infected with disease if she did not submit to sex with him.  He also indicated that she would be killing him by withholding sex.

## DEFENDANT'S BOARD MEMBERS ARRANGE FOR NORLHA TO SEXUALLY ASSAULT DOE 1

101.  In 2015, as Doe 1 sought to end Norlha's sexual abuse, Norlha's control of her intensified.  He began calling her between 20 and 50 times a day on her phone.  He subjected her to nonconsensual sexual contact three to four times a day.

102.  The sex was interspersed with humiliation.  For instance, Norlha would make disparaging remarks about the appearance of her vagina.  At times, when the sexual contact was apparently concluded, he would permit her to put her clothes back on, only to force her to undress again to begin sexually assaulting her once more.

103.  Norlha openly pursued Doe 1 around KTC's grounds.  He repeatedly asked KTC residents to tell him her whereabouts and sent people to bring her to him.

104.  By then, Norlha's incessant public sexual assaults became unmanageable for Doe 1, which she communicated to Defendant's Board Members.

105.  Defendant's longtime Board Members Skolnick, Lordi, and Rogner's response was to maintain a system so that Norlha's sexual abuse of Doe 1 could proceed privately and without interruption—at their specified times and locations.

106.  For decades, Skolnick, Lordi, and Rogner had known of Norlha's pattern of sexual predation.  They were directly knowledgeable about Norlha's sexual abuse of Doe 1, and each did nothing to prevent or stop it.

107.  Doe 1 repeatedly told Skolnick that she did not know if she could physically continue having sex with Norlha.  Skolnick intimated that since the abuse was yielding benefits for Norlha, Doe 1 must continue providing herself to him.

## NORLHA RAPES DOE 1, DOE 1 REPORTS IT TO KTC BOARD MEMBER

108.   In 2015, Norlha was sexually assaulting Doe 1 during one of the many times which Defendant's leadership had coordinated.  Norlha masturbated over Doe 1 while penetrating her digitally.  He then held her down and got on top of her.  Norlha weighed over 300 pounds.  Doe 1 weighed less than half of that at the time.

109.   Doe 1 felt crushed by Norlha's weight.  She told him that he was hurting her, to stop, and to get off.  He replied that she was hurting him, and he continued to hold her down while he penetrated her vaginally.  Doe 1 believed she was going to die under the force of his weight.

110.   When Norlha finally concluded and let her up, Doe 1 went downstairs and told Skolnick that Norlha had raped her.

111.   Skolnick told Doe 1 that it was all a misunderstanding.  Skolnick provided a series of excuses and deflections, saying that it was just a miscommunication, that Norlha was getting old and not making sense, and that he had not really meant it.

112.   Later that day, Norlha came downstairs enraged that Doe 1 had confided in Skolnick and shouted at Doe 1.

## DOE 1 SAYS NO TO NORLHA, HER REFUSAL IS OVERRIDDEN

113.   On several occasions on or around 2016, Doe 1 repeatedly expressed to Norlha that she did not want to have sexual contact with him.  She told him that she felt unstable mentally.  At times, Norlha would apparently accept her decision, only to call her back later and initiate sexual contact again.  At other times, he responded by pressuring her for a hug or to sit touching knees.  Once she complied, he would then lift her skirt up.

114.   During this time, Doe 1 began experiencing urges to flee.  She was visibly falling apart mentally.

### DOE 1'S MOTHER REMOVES HER FROM KTC

115.   In July 2016, Doe 1 learned that Tai Situ, a notable leader of Defendant's parent organization and Defendant's director, would be in New York for one of Defendant's events.  On information and belief, Norlha personally deferred to Tai Situ.  On information and belief, Situ had a position of authority over Defendant, which has close ties to Situ's international organization.  Unbeknownst to Doe 1, Tai Situ had already been informed about Norlha's sexual predation in 1999 by Plaintiff Jane Doe 2 as detailed below.

116.   Doe 1 sought an appointment to speak with Tai Situ about her situation with Norlha. However, Situ would not see her.

117.   In mid-2016, Doe 1's life had become a living hell.

118.   As Doe 1's mental health increasingly deteriorated from the abuse, on or around 2016, Doe 1's mother traveled across the country, packed up her daughter's belongings, and flew her to California.

119.   From 2016 until today, Doe 1 has had daily panic attacks, undergone intensive psychotherapy, and been under psychiatric care.  Seven years after escaping from Norlha and Defendant, Doe 1 still suffers from panic disorder, acute symptoms of post-stress traumatic disorder, and anxiety attacks.

**PLAINTIFF JANE DOE 2**

**DEFENDANT'S KNEW ABOUT NORLHA'S ABUSE IN THE 1980s**

120.   On information and belief, Doe 1 was one of Norlha's last sexual targets before he died in 2018.

121.   But Norlha's abuse and Defendant's role in it began much earlier, and Defendant was aware of it decades before Doe 1 came to KTC.

122.   On information and belief, Norlha subjected one young woman, Sally Smith,[3] to unwelcome sexual contact beginning in 1982.  She was 22 years old.  Norlha abused Smith for nearly ten years until she spoke out, informing Defendant and Defendant's wider community about the abuse she endured.

123.   On information and belief, Defendant and its leaders and Board Members were aware of Norlha's conduct with Smith while it was going on.

**JANE DOE 2 IS INTRODUCED TO DEFENDANT AND FORCED TO BEND TO NORLHA'S WILL**

124.   In 1984, Plaintiff Jane Doe 2 was in her mid-20s.  She was a college graduate with a promising future as a writer in New York City and an apartment in Manhattan.  A recently ended long-term relationship had left her vulnerable, hurt, and distraught.

125.   One of Doe 2's acquaintances encouraged Doe 2 to meet Norlha in or before 1983. She agreed to meet him, but she was initially unimpressed.  This friend and another friend, Carolyn Cannon Hoberman, talked often to Doe 2 about Norlha.  They urged her to go to see him in

---

[3] This person's name has been changed for privacy reasons.

Wappingers Falls.  They spoke of Norlha with the highest possible regard.  On information and belief, Hoberman was Defendant and Norlha's close associate, and she served on boards of organizations headed by Norlha.

126.   Hoberman also knew about Doe 2's vulnerable state in 1984.  Hoberman praised Norlha as an extraordinary person with special insight capable of helping Doe 2.

127.   After persistent encouragement from both her friends, Doe 2 eventually began attending activities led by Norlha in Manhattan as well as at Defendant's headquarters in Wappingers Falls.

128.   In 1985, Hoberman met with Doe 2 in New York City on Norlha's behalf on several occasions to encourage her involvement in Norlha's activities.  When Doe 2 visited KTC for programs, Shoshana Rogner, Defendant's Treasurer, would often retrieve Doe 2 to bring her to Norlha's room for private interviews, even though Doe 2 had not requested them.  Norlha took a keen interest in Doe 2.

129.   Norlha, Hoberman and Defendant's leadership showered Doe 2 with representations that Norlha was an altruistic person interested only in what was best for her.

130.   Then, in 1987, Doe 2 visited KTC for a month-long retreat, falling deeper under its control.  Doe 2 had always been very interested in art and literature and wanted to be a writer, but Norlha discouraged her interest in these fields, maintaining that they were meaningless.

131.   Before Doe 2 met Norlha she was independent, well-adjusted, and confident.  Now, surrounded by people who constantly extolled Norlha's superior wisdom and abilities, Doe 2 began to doubt her own judgement.

### DOE 2 MOVES TO KTC AND HER DEPENDENCE ON DEFENDANT INCREASES

132.   Defendant's leadership and Norlha himself strongly encouraged members to cut off ties with their friends and family and move to KTC.  They represented that KTC was a safe and secure environment where members could learn techniques to free themselves from pain.

133.   Attracted by the prospect of studying meditation and philosophy, Doe 2 began renting a room at KTC in 1987.  She spent another part of the week at Defendant's affiliate center, Kagyu Dzamling Kunchab ("KDK"), located at 35 West 19th Street, New York, New York.  On information and belief, at all material times, KDK was also run by Norlha, and its board members and leadership overlapped with Defendant's.

134.   In 1987, Defendant appointed Doe 2 as Norlha's personal secretary.  She also cooked for him, tidied his rooms, and served him as an attendant.  These were privileged positions within KTC and a way for Norlha to keep Doe 2 close and spend a lot of time with her alone.

135.   Norlha began pushing Doe 2 to intensify her commitment.  One day he placed a set of clothing in her lap and urged her to formally renounce her personal relationships, change her clothing and name, and shave her head.

136.   Doe 2 expressed a great unwillingness to do this.  She told him she wished to marry some day and preferred not to cut her hair.  Shaving her head and cutting off relationships would hinder her ability to support herself in the future.  Doe 2 had also wanted to attend graduate school at some future time.  Following his pattern of ignoring her will, Norlha doubled down on his efforts to coerce her to follow his instructions.

137.   In late 1987, Norlha paid for Doe 2 to travel with him to India, where she was further distanced from her friends and family.  Even so, Doe 2 clearly stated to Norlha that she did not wish to renounce her freedom; she wanted to have personal relationships and marry.

138.   While in India, in the winter of 1987 to 1988, Norlha compelled Doe 2 to swear total obedience to his commands.

139.   From that point forward, Doe 2 wore special clothes that set her off from society, kept her hair very short or shaved, and generally displayed her group membership.

140.   In January 1988, in Delhi, India, Norlha summoned Doe 2 into a room alone with him for an interview.  He was only wearing his underwear.  He ordered her to lay down and got on top of her.  He pressed into her and kissed her, remaining there for several minutes.  He was very heavy, more than twice Doe 2's weight, and she felt crushed.  He told her she would not have to worry about anything.  Doe 2 felt shocked and frozen.  Finally, he got off of her.  Shaken, Doe 2 left the room as soon as possible.

## NORLHA BEGINS SEXUALLY ASSAULTING DOE 2

141.   After returning to Wappingers Falls in early 1988, Norlha and Defendant pressured Doe 2 into performing hard manual labor, including extending the roof on a building and constructing a porch.  Eventually Doe 2 would help dig and build basements underneath the Retreat Center.

142.   Around this time, Doe 2 was appointed as Norlha's English teacher to help him prepare for his citizenship exam.  This allowed Norlha to have more time alone with Doe 2.

143.   At that same time, Norlha began sexually assaulting Doe 2.  He told her that he was helping her and that she was special.  Confused and overwhelmed, Doe 2 asked him if he was also doing this with other women.  Norlha told her no, that she was the first woman he had ever been with.  He said that this kind of sexual connection to him would benefit her and if she did not do it, she would have obstacles.  Then he swore her to secrecy.

144.   In the daytime, Norlha would repeatedly force Doe 2 to lie on the floor, while he lay on top of her, rubbing his groin vigorously against her vagina until he ejaculated.  At night, he did the same thing but in his bed, where he would be nude.

145.   Norlha also assaulted Doe 2 at KDK in Manhattan.  One such instance was after a lecture.  Norlha ordered Doe 2 to undress, laid on top of her, and similarly rubbed his groin vigorously against her vagina until he ejaculated.  She did not consent.

146.   Norlha often told Doe 2 that the sexual abuse was solely to help her and that he had no personal interest in it.

147.   During this time, Norlha weighed over 200 pounds, and Doe 2 weighed less than half of that.  He was more than two decades older than her.  She was coerced into this by him, did not consent, and felt powerless.  During the sexual encounters she froze while he gratified himself.

148.   A few months after the first sexual assault in early 1988, Doe 2 told Norlha that she was very distressed about the sexual conduct.  He maintained that he was helping her and that it was for her benefit only.  She was distraught and anxious, but he disregarded her objections and insisted that that they continue.  Thereafter, whenever she voiced her distress about the sex, he disregarded her and told her it would continue.

149.   Defendant's leaders continued to allow Norlha to sexually assault Doe 2.

150.   After the first sexual contact in 1988, Shoshana Rogner, who was Defendant's Treasurer, would encourage and enable Doe 2's proximity to Norlha, thereby allowing him to continue to sexually assault her.

151.   On information and belief, Rogner was aware that Norlha was sexually assaulting Doe 2.  On information and belief, other members of Defendant's leadership knew or should have known as well.

152.   In early 1990, Norlha raped Doe 2 by inserting his penis into her vagina.  Even as Doe 2 told him that the sexual activity was harmful to her, Norlha ignored her objections.  He continued to subject her to such forceful sexual assaults for another two years.

153.   Doe 2 experienced escalating emotional and psychological distress and told Norlha this.

154.   Yet Norlha and Defendant's Board Members and leadership did nothing to prevent or stop it, and Norlha continued to assault her about twice a week or more.

## DOE 2 ENTERS THE THREE-YEAR RETREAT WHERE NORLHA'S SEXUAL ABUSE CONTINUES

155.   Doe 2 had wanted to enter the Three-Year Retreat so that she could develop a structured approach to meditation.  However, she expressed her trepidation to Norlha given the seriousness of the commitment.

156.   Norlha told her that because she swore to obey him, she had to do whatever he wanted, and he wanted her in the Three-Year Retreat.  If she did not participate, she would be condemned to hell.

157.   Seeing no other choice, Doe 2 entered the Three-Year Retreat in 1991.   Other participants included Plaintiff Doe 3, Smith, and Skolnick.

158.   While in the Three-Year Retreat, Norlha and Defendant's Board Members and leaders maintained complete control over the participants' physical environment.

159.   Doe 2 became completely dependent upon Defendant and Norlha for housing, food, medical care, and other material support, as well as safety from physical harm.

160.   A few weeks into the Three-Year Retreat, Doe 2 was called to a private interview with Norlha, where he once again subjected her to nonconsensual penetrative sex.

## DOE 2 REFUSES TO HAVE SEX WITH NORLHA & SUFFERS RETALIATION

161.   Doe 2 had often told Norlha that the sex was not helping her as he promised it would, and that it was harming her.   Shortly before the retreat started, she had expressed her distress again strongly and told him she felt like he was using her.

162.   A couple of months after the first assault in the Three-Year Retreat, on or around late 1991 or early 1992, Doe 2's distress had built up so much that she confidently told Norlha that she would not have sex with him anymore.

163.   As a result, Norlha became enraged and hostile.   He cut Doe 2 off from his support as her teacher and counselor.   Doe 2 had always feared this would happen if she ever crossed him, but what followed was worse than she had imagined.   He began psychologically abusing her.   This psychological torture while in the Three-Year Retreat left Doe 2 in serious mental distress and caused her to experience severe panic attacks and anxiety daily.   It continued for the remainder of the Three-Year Retreat.

164. Doe 2 informed Susan Skolnick, Defendant's longtime Board Member and leader, about Norlha's sexual abuse and his retaliation against her.

165. Skolnick told Doe 2 that it was her problem if this upset her. No steps were taken to protect anyone from further sexual assault.

### DOE 2 INFORMS DEFENDANT ABOUT NORLHA'S PATTERN OF ABUSE

166. In the following years, Doe 2 informed several people with authority over Norlha and Defendant of the sexual assaults she experienced.

167. Doe 2 reported her sexual abuse to Tai Situ in 1999. Situ's longtime head of staff, Tenam Shastri, is currently one of Defendant's Board Members. On information and belief, Shastri was privy to the same information about Norlha's sexual predation as Situ.

168. In response, Situ told Doe 2 that they would not make a big deal of it because Norlha was a good person.

169. On information and belief, at this time, Norlha was bringing in major resources and developing valuable riverfront property in the Hudson Valley.

170. Because of Tai Situ's failure to act, Norlha continued to have unrestricted access to young, vulnerable women, including Plaintiff Doe 1 in the 2010s.

171. In 2003, Doe 2 informed Mingyur Rinpoche, a teacher with close ties to Situ, of the sexual abuse. Mingyur occupied an important role within Defendant's larger organization. Despite his first-hand evidence, on information and belief, although he was informed of Doe 2's first-hand experience, Mingyur took no steps to ensure women were not harmed by Norlha.

172. As a result of the abuse and trauma Doe 2 experienced, she has suffered severe mental health issues and hospitalizations, including, but not limited to, a psychotic episode, severe

anxiety, an eating disorder, and PTSD.  This greatly impacted Doe 2's ability to earn a living and live a confident, healthy life.

## PLAINTIFF JANE DOE 3

**JANE DOE 3 IS RECRUITED TO KTC AND SUBJECTED TO NORLHA'S CONTROL**

173.  Jane Doe 3 first encountered Norlha and Defendant in September 1986 while attending Vassar College.

174.  She began attending activities at KTC in November 1986.  Once there, Doe 3 observed Norlha actively recruiting young people to KTC.

175.  In January 1987, Doe 3's mother passed away unexpectedly.  In February 1987, her grandmother passed away as well.  These sudden, successive losses left Doe 3 vulnerable.

176.  A few weeks later, Doe 3 moved into a room at KTC and lived there for the remainder of her final semester of college.  She was drawn in more deeply and gave up all her other plans, including withdrawing her status as a Fulbright Award finalist.

177.  In 1987, Doe 3 became a full-time volunteer, student, and resident at KTC.  During this time, Defendant's leadership including Board Members Rogner and Jane Madill told Doe 3 that Norlha was infallible, and she should revere him.

178.  Defendant's leadership also persuaded Doe 3 to submit to Norlha.  For example, Rogner and Madill repeatedly echoed the view that Norlha knew what was best for everyone.

179.  Norlha began urging her to step up her commitment by renouncing her personal relationships.  In March 1987, he suggested that she minimize contact with her family to one phone call per month.  Later he told her that she should stop visiting her family, because they were a bad

influence.  He also told her that she did not need her old friends, and that her friends at KTC were much better.  Though this saddened Doe 3, she wanted to be a good student, and complied.

180.   In May 1987, Doe 3 informed Norlha of her intention to relocate to France to study under a different teacher.  Norlha vocally opposed this plan.  Though his advice sounded manipulative, she was assured by Rogner that Norlha's advice was always in her best interest.

181.   Swayed by this pressure and fearing repercussions for displeasing Norlha, she stayed.

182.   In summer 1987, Norlha requested that Doe 3 become his personal attendant and cook.  This was considered a great honor.  From this time onwards, Doe 3 often ate dinner privately with Norlha in his apartment.

183.   In fall 1987, Norlha announced his desire for Doe 3 to change her clothing and name and shave her head.  He told her that she should be celibate for the rest of her life.   Doe 3 told Norlha she did not wish to take that step, as she wanted to have a romantic partner and be a mother one day.

184.   Norlha then subjected Doe 3 to a public campaign of psychological manipulation and grooming.  He teased and belittled her for her reluctance to increase her commitment.  He mocked the value of motherhood, portraying children as a demeaning burden.  He touched her hair and told her he could not wait to see it shaved.  He took out a tape measure and measured her body for special garments and described his eagerness to see her in them.  When she objected, he said that he was able to see clearly what was best for her, while she did not.

185. Doe 3 again experienced doubts about Norlha's judgment.  When Doe 3 approached Defendant's Treasurer, Rogner, for advice, she told her that for Norlha to take such an interest in her was a sign that she was special.  She reminded her that Norlha knew better than other people.

186. Norlha and Defendant's leadership began to erode Doe 3's confidence in her own decision-making ability.  Doe 3 came to believe that she would be shunned and would have to leave her new home at KTC if she did not acquiesce to Norlha's wishes.

### DOE 3'S FIRST INSTANCE OF SEXUAL ABUSE

187. In fall 1987, Defendant's officials organized a trip to India with Norlha and pressured Doe 3 to join.

188. While in India, far from a familiar context, Doe 3 succumbed to Norlha's pressure and donned the special garments and shaved her head.  She watched him put pressure on other young people around her as well, including Plaintiff Jane Doe 2, to shave their heads, take new names and don new clothes.  This made her very uncomfortable, but she had begun to doubt her own judgment.

189. It was now understood that the group's will should dominate; personal will was secondary.

190. On January 26, 1988, Norlha invited several young women including Doe 3 to come to his hotel room for a "private interview."  Lordi, who on information and belief was one of Defendant's Board Members and/or leaders at the time, coordinated the appointments.  Lordi brought young women to Norlha as he awaited them dressed only in his undergarments.

191. Once Lordi escorted Doe 3 to Norlha's hotel room, Norlha gestured for Doe 3 to sit next to him on his bed, which she did.  They spoke for a few minutes and then he grabbed her,

yanked her towards him, and pressed his chest against hers.  He moved his face toward hers, but Doe 3 wrenched away, stunned.  Unable to speak and in shock, she ran out of the room.

192.   After this assault, Doe 3 sought a way to leave and return to the United States, but Defendant had her plane ticket, and she had no money to get to the airport or buy another one.  She was entirely dependent on Norlha and Defendant.

193.  Doe 3 was deeply troubled by her loss of autonomy but felt she had no choice but to stay silent and compliant until she was back in the United States.

**DOE 3 RETURNS TO NEW YORK: A PATTERN OF ASSAULT BEGINS**

194.   When they returned to New York in January 1988, Doe 3 asked Norlha to clarify his actions in India.  He explained that engaging in sex with him would be good for her.

195.   Still struggling to understand the nature of his actions toward her, Doe 3 asked Norlha whether he had had sex with other students before.  He promised that he had never had sexual contact with anyone.  He told her that he was able to perceive that she had a very special and rare bond with him.  Trusting in the reputation that Defendant had created for Norlha as an honest and trustworthy leader, Doe 3 believed him.

196.   Gradually Norlha eroded Doe 3's resistance.  Two weeks after returning from India, he instructed her to meet him in his bedroom late at night.  When she arrived, he immediately ordered her to remove her clothes and get into bed with him.

197.   At the time, Norlha was 50 and Doe 3 was 22 years of age.  Although she saw Norlha as a grandfatherly figure, she complied with his command to enter his bed naked, despite her confusion and lack of consent.  He proceeded to penetrate her vaginally.

198.   Thereafter, Norlha established a pattern that would continue for the next two years, whereby once or twice a week he would command her to come serve him his meal and come back later at night to have sex.  He then expelled her from his room in the early hours of the morning.

199.   Beginning in 1988, Norlha and Defendant forced Doe 3 to perform manual labor, both working on Defendant's grounds and renovating Robert Kelly's house.

200.   During early 1991, Doe 3 became aware of another student whom Norlha was using sexually.  On one occasion, to confirm her suspicions, Doe 3 waited until after 10pm and went to the place where people left their shoes outside Norlha's room.  By looking there, anyone could see who was in the room with him, at what hour and for how long.  Her suspicions were confirmed.

201.   Doe 3 considered leaving KTC, but at this point, she had come to want to participate in the Three-Year Retreat.  Doe 3 wanted more education, and the Three-Year Retreat was a path towards getting there.  She understood that she had to stay on Norlha's good side to be accepted.  She also assumed that being in the Three-Year Retreat would be a way for her to cease physical contact with Norlha.

### DOE 3 ENTERS THE THREE-YEAR RETREAT

202.   Doe 3 entered the Three-Year Retreat in July 1991.

203.   There, Defendant's leaders regularly arranged for Norlha to have private meetings with the participants on the Retreat Center grounds.

204.   Defendant's leadership told the participants that attending these interviews was important to their ability to withstand the rigors of the Three-Year Retreat.  Indeed, withholding access to these interviews was a punishment that Doe 3 observed wielded against Plaintiff Doe 2.

205.   Every few months, Defendant's leadership including Skolnick would summon Doe 3 to a private interview where Norlha would initiate sexual contact.

206.   During one such interview early in the Three-Year Retreat, Norlha asked Doe 3 to lay down in the middle of the house and show him her vagina.  He climbed on top of her and penetrated her.

207.   The Retreat Center had very thin walls and was usually very silent.  On at least one occasion, Norlha spontaneously sought out Doe 3 in the middle of the group's meditation.  The other participants, including Skolnick, certainly heard him entering her room.

### KTC LEADERSHIP KNOWINGLY ENABLES NORLHA'S ABUSE

208.   On at least one occasion, Skolnick directly witnessed Norlha vaginally penetrating Doe 3 outdoors on KTC grounds.

209.   Once she was aware of Skolnick's knowledge (and therefore Defendant's knowledge) of Norlha's sexual abuse, Doe 3 fully disclosed Norlha's sexual abuse to Skolnick.

210.   In response, Skolnick said, *inter alia*, that Norlha would never do anything to harm her; he was a safe person; he was trustworthy; and Doe 3 should trust Norlha's judgment over her own.

211.   The Three-Year Retreats also had "headmistresses" purportedly in charge of the welfare of the participants.  The headmistress caught Norlha laying down and penetrating Doe 3.  Doe 3 later witnessed Norlha and the headmistress having a conversation in pressured, urgent tones.  She hoped that the headmistress would approach her wanting to talk to her about what she had witnessed, but nothing happened.

212.   Neither Skolnick, Rogner, nor any other of Defendant's Board Members or leaders did anything to intervene at that time or, on information and belief, at any time thereafter.   No steps were taken to restrict Norlha's access to young women living on Defendant's premises.

213.   On the contrary, Defendant's Board Members and leadership not only retained Norlha in his position, they continued to vest him with supreme authority over women and persuaded those women to remain in the Three-Year Retreat where they were isolated and completely vulnerable to Norlha's predation.   As a result, he was enabled to continue abusing Doe 3, and eventually to begin abusing Plaintiff Jane Doe 1.

**NORLHA SEEKS RETRIBUTION FOR DISOBEDIENCE**

214.   About a year into the Three-Year Retreat, in 1992, Smith left and resumed a relationship with a former boyfriend.

215.   In a rage over Smith's departure, Norlha frequently summoned all the women in the Retreat Center, including Skolnick and Plaintiffs Doe 2 and Doe 3, to listen to his vengeful tirade against Smith and her boyfriend.

216.   On at least one occasion, he raged for two hours straight.   Norlha said Smith was possessed by a demon.   Privately, during their interviews for the next two months, Norlha raged to Doe 3 about Smith and her boyfriend.   He seemed obsessed and jealous.   These rage sessions left Doe 3 and others feeling afraid.

217.   The day after the Three-Year Retreat ended, Norlha told everyone that they needed to exorcise the demons from the Retreat Center.   He made effigies of a woman and a man and ordered everyone to conduct a ritual murder in which the effigies were destroyed and banished.

218.   Doe 3 understood Norlha's response to Smith's departure as a warning about what would happen if they sought their freedom and disobeyed him.  Norlha told Plaintiff Doe 2 that she was similar to Smith, and he directed even more fury at Doe 2 as if she were Smith's proxy.

219.   The group's retaliation against Smith left Doe 3 feeling that her safety depended on her continuing submission to Norlha.

**DEFENDANT KNOWINGLY PLACED PLAINTIFFS IN DANGER OF HEPATITIS B**

220.   On information and belief, Defendant knew since at least 1987 that Norlha had Hepatitis B, a disease that can be transmitted sexually and causes liver damage, liver failure, liver cancer and death.[4]

221.   On or around 1993, Defendant's Board Member Skolnick told Plaintiff Doe 3 that Norlha had Hepatitis B.

222.   At this point Norlha had been sexually abusing multiple women, including Plaintiffs Doe 2 and Doe 3, for more than a decade.  Defendant's Board Members and leadership were aware of this.

223.   Norlha never used contraception with any of the Plaintiffs.  On information and belief, Defendant's Board Members and leadership were also aware of this.

224.   Skolnick told Plaintiff Doe 3 to get tested for Hepatitis B.  She never told either of the other Plaintiffs, nor did any of Defendant's other Board Members or leaders.

---

[4] *Viral Hepatitis – Frequestly Asked Questions for the Public*, Centers for Disease Control and Prevention (March 9, 2023), https://www.cdc.gov/hepatitis/hbv/bfaq.htm.

### DOE 3 ENTERS A SECOND THREE-YEAR RETREAT, BREAKS DOWN AND ESCAPES

225.   In 1994, Doe 3 completed the Three-Year Retreat and wanted to leave KTC.   She made plans to do a subsequent retreat in solitude in a place of her own, a plan that would normally be acceptable and praiseworthy to KTC's leaders.

226.   However, when she told Norlha of her plans in or around 1995, he became furious and told her she could not leave.   He wanted her to stay and serve as a translator and caretaker in the next Three-Year Retreat.   He told her that she would never be capable of doing her own retreat or living a good life on her own.   He said her life would only be good if she stayed.

227.   In April 1996, with great reluctance, she entered a second Three-Year Retreat as instructed by Norlha.

228.   There, Doe 3's mental health swiftly began to deteriorate.   In 1997, while still trapped in the Three-Year Retreat, she began planning ways to escape Defendant.   However, because she was isolated physically, emotionally, and financially, she found herself unable to do so.

229.   At times, late at night, Board Member Skolnick escorted Doe 3 outside the Retreat Center for Norlha to sexually abuse her.   When Doe 3 left late at night, it was impossible to hide the sound of her footsteps outside the building; because it was surrounded by a wide gravel path, she would have been heard by at least two retreatants, one of whom was Charlotte Kelly.

230.   In 1999, as soon as the Three-Year Retreat ended, Doe 3 began urgently looking for a way to escape Norlha and Defendant.   When she heard that Norlha was looking for someone

to teach at a related facility in Virginia, Doe 3 quickly volunteered.  He agreed to send her to Virginia, but only for a short time.

231.   When Norlha began calling Doe 3 to return from Virginia to KTC, she came up with excuses not to leave her post there.  This made Norlha angry, but she stood firm.  Doe 3 was finally out and was determined to stay out.

## **AFTERMATH**

232.   After she left KTC in 1999, Doe 3 spoke with Skolnick again about the abuse Doe 3 endured over the years.  She asked Skolnick to consider the implications of Norlha's behavior with young women.

233.   After leaving the Center, Doe 3 heard directly that Norlha was speaking disparagingly about her and encouraging KTC members to shun her.  Doe 3 was ostracized by people that she had come to believe were her family.  Back at KTC, some women she considered her sisters refused to look at her and avoided her.

234.   As she sought to reconstruct a life for herself in the wake of the years of coercion and abuse at KTC, Doe 3 began to recognize how severely Norlha had distorted her life's path.

235.   Doe 3 returned to visit Defendant occasionally.  She was very concerned about whether Norlha's pattern of abuse was continuing.  She checked in with Skolnick periodically to ask whether Norlha was continuing his abusive behaviors.

236.   In 2006 or earlier, Skolnick assured Doe 3 that a medical condition prevented Norlha from any further sexual activity, and that no one was at risk of being abused by him any longer.   Doe 3 believed Skolnick when she said that things had changed and young women were not in danger there now.  What Skolnick said was false.

**DEFENDANT AND NORLHA ADMIT TO WRONGDOING**

237.   On October 16, 2016, Doe 1 contacted Doe 3 by phone.

238.   Doe 1 told Doe 3 that Norlha's sexual abuse was continuing despite Skolnick's promises.

239.   Doe 3 convened an online meeting of women she suspected had also been sexually abused by Norlha.  During a video call in October 2016, all four women confirmed that they had been coerced into sex with Norlha.  They also determined that Defendant's Board Members knew about the abuse and did nothing.

240.   Doe 3 sought a meeting with those in positions of power at Defendant and confronted them with the allegations.

241.   Doe 3 persuaded KTC's Board Members to engage an independent organization to conduct an investigation.

242.   The investigation concluded that the women's allegations, including Plaintiffs', were credible.  Plaintiffs Doe 1 and Doe 2's stories were shared anonymously.

243.   In April 2017, Defendant held a community disclosure meeting to speak for the first time about Norlha's decades of abuse.

244.   During the meeting, Norlha admitted his misconduct and apologized via video message.   On information and belief, Defendant also admitted wrongdoing.

245.   On information and belief, until this time the Defendants had no policy or practices in place to safeguard women from abuse and it was only after the Plaintiffs' intervention that Defendant created an ethics policy in 2017.

## PLAINTIFFS' DAMAGES

246.  In addition to the damages mentioned above, as a direct and proximate result of Defendant's conduct, Plaintiffs suffered, continue to suffer, and will suffer in the future, psychological injuries, including but not limited to, low self-esteem, loss of faith, anxiety, panic attacks, psychosis, post-traumatic stress disorder, eating disorders, stress, insomnia, nightmares, depression, suicidal ideations, distrust of authority, shame, disassociation, intimacy issues, fear, obsessive thoughts, trust issues, challenges in building and sustaining friendships, and physical injuries associated with at least some of these psychological injuries, including, but not limited to, heart palpitations.  All these injuries caused and will cause Plaintiffs noneconomic damages. Plaintiffs also suffered and continue to suffer economic damages in the form of loss of past and future income and costs of medical and mental health treatment.

247.  Defendant acted with an outrageous indifference to a highly unreasonable risk of harm and with a conscious indifference to the health, safety, and welfare of others, including Plaintiffs.  Therefore, Plaintiffs are entitled to punitive damages against Defendant.

## COUNT I

## SEX TRAFFICKING & ATTEMPTED SEX TRAFFICKING
### (18 U.SC. §§ 1591, 1594(a), & 1595)

### *Plaintiff Doe 1 against Defendant – Direct Liability*

248.  Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

249.  In violation of 18 U.S.C. §§ 1591 and 1594(a) Defendant knowingly, in or affecting interstate or foreign commerce, recruited, harbored, enticed, provided, obtained, maintained, and

solicited, or attempted to recruit, harbor, entice, provide, obtain, maintain, and solicit, Plaintiff Doe 1 knowing that means of force, fraud, and/or coercion would be used to cause Doe 1 to engage in commercial sex acts.

250.   Defendant's violations of 18 U.S.C. § 1591 and/or 18 U.S.C. § 1594(a) are actionable pursuant to 18 U.S.C. § 1595.

251.   As a direct and proximate result of Defendant's violations of 18 U.S.C. §§ 1591, 1594(a), and 1595, Plaintiff Doe 1 suffered the injuries and incurred the damages described in the preceding paragraphs.  Plaintiff Doe 1 is also entitled to reasonable attorney's fees.

## <u>COUNT II</u>

### <u>SEX TRAFFICKING & ATTEMPTED SEX TRAFFICKING</u>
### (18 U.SC. §§ 1591, 1594(a) & 1595)

#### *Plaintiff Doe 1 against Defendant – Vicarious Liability*

252.   Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

253.   In violation of 18 U.S.C. §§ 1591, 1594(a), and 1595, Norlha knowingly, in or affecting interstate or foreign commerce, recruited, enticed, obtained, and solicited, or attempted to recruit, entice, obtain, and solicit, Doe 1 knowing that means of force, fraud, and/or coercion would be used to cause Doe 1 to engage in commercial sex acts.

254.   At all material times, Norlha was the director, leader, employee, representative, and/or agent of Defendant.

255.   At all material times, Norlha was acting in furtherance of his employer's, Defendant's, business interest.

256.  At all material times, Norlha's conduct occurred while on Defendant's premises and while he was the director, leader, employee, representative, and/or agent of KTC.

257.  Prior to when Doe 1 was sexually assaulted, Norlha had a long history of similar conduct with young women (including Plaintiffs Doe 2 and Doe 3).  Norlha's grooming and then sexual abuse was his common pattern of sexually exploiting young women.

258.  At all material times, Norlha's behavior was generally foreseeable by Defendant.

259.  At all material times, Norlha's conduct arose while acting in the scope of his employment with Defendant.

260.  At all material times, Defendant was vicariously liable for Norlha's violations of 18 U.S.C. §§ 1591 and 1594(a).

261.  Defendant's liability for Norlha's violations of 18 U.S.C. § 1591 and/or 18 U.S.C. § 1594(a) are actionable pursuant to 18 U.S.C. § 1595.

262.  As a direct and proximate result of Defendant's liability for Norlha's violations of 18 U.S.C. §§ 1591, 1594(a), and 1595, Doe 1 suffered the injuries and incurred the damages described in the preceding paragraphs.  Doe 1 is also entitled to reasonable attorney's fees.

## COUNT III

## SEX TRAFFICKING
### (18 U.S.C. §§ 1591 & 1595(a))

### *Doe 1 against Defendant – Beneficiary Liability*

263.  Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

264.   Defendant knowingly benefited or attempted to benefit, financially or by receiving something of value, from participation in a venture which it knew or should have known engaged in an act in violation of 18 U.S.C. §§ 1591 and 1595(a).

265.   **Knowingly Benefit**.  At all relevant times, Defendant knowingly received a benefit or attempted to receive a benefit from participation in a venture which it knew or should have known engaged in an act in violation of 18 U.S.C. §§ 1591 and 1595(a).

266.   **Participation in a Venture**.  At all relevant times, Defendant, through the actions of its leaders and followers, engaged in a decades-long venture with Norlha of recruiting, enticing, harboring, providing, obtaining, maintaining, and/or soliciting young, vulnerable women such as Plaintiffs.  Once on Defendant's grounds, the women were groomed by Norlha and Defendant's leadership, who caused them to believe he was an all-powerful teacher, and that they were special and required his guidance to live.  Completely trusting in Defendant and Norlha, they were isolated from their families and the outside world, physically vulnerable, and sleep-deprived, thereby becoming wholly dependent on Norlha and Defendant.  It was under these circumstances that Norlha knowingly forced women, including Plaintiffs, into sex acts.  Defendants provided knowing assistance, support, and facilitation to this venture.  In Doe 1's specific case, that assistance was, for example, creating a system to facilitate Norlha's sexual abuse.

267.   **Knew or Should Have Known That Venture Violated 18 U.S.C. § 1591**.  At all relevant times, Defendant was aware that the venture was engaged in acts against Doe 1 that violated 18 U.S.C. § 1591.  As alleged above, Defendant's Board Members and its other officials directly violated 18 U.S.C. § 1591.

268.   As a direct and proximate result of Defendant's violations of 18 U.S.C. §§ 1591, and 1595(a), Doe 1 suffered the injuries and incurred the damages described in the preceding paragraphs.  Doe 1 is also entitled to reasonable attorney's fees.

## COUNT IV

## NEGLIGENCE
### (New York state common law)

### *All Plaintiffs Against Defendant*

269.   Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

270.   **Duty**.  At all relevant times, Defendant owed a duty of care to Plaintiffs to act reasonably to prevent foreseeable abuse perpetrated by Norlha.

271.   At all relevant times, Defendant owed a duty of care to Plaintiffs, invitees on its property, to keep the property free from foreseeable dangers including sexual abuse.

272.   At all relevant times, Defendant owed a duty of care to Plaintiffs in the Retreat Center to keep them safe in premises over which Defendant was the sole custodian and controller.

273.   At all relevant times, Defendant owed a duty of care to Plaintiffs to properly oversee its facilities such that individuals living at, visiting, or attending them were safe from foreseeable dangers including sexual abuse.

274.   **Foreseeable Danger**.  At all relevant times, Norlha openly and notoriously engaged in the mistreatment, sexual abuse, and sexual assault of women associated with, employed by, and/or visiting KTC, including Plaintiffs.

275.  At all relevant times, Defendant encouraged Plaintiffs to believe that Norlha was an all-seeing, powerful person who they were required to idolize and to rely on to make all their life decisions.

276.  At all relevant times, Norlha used the power bestowed upon him by Defendant to prey upon and sexually abuse Plaintiffs on Defendant's premises.

277.  At all relevant times, Defendant's employees, agents, managers, and Board Members knew or should have known about Norlha's propensity to mistreat and sexually abuse women, and that he was a danger to women.

278.  At all relevant times, Defendant knew or should have known that Norlha was sexually assaulting numerous women including Plaintiffs.

279.  Examples of Defendant's actual knowledge include, but are not limited to:

   a.  **For Doe 1**: Defendant's Board Members and leaders created a system to facilitate Norlha's sexual assaults and told her to continue to submit to sexual assault for the benefit of his health.  In addition, other leaders, such as Mingyur Rinpoche and Tai Situ, were previously informed that Norlha was a sexual predator and did nothing.

   b.  **For Doe 2**:  Doe 2 directly told Defendant's Board Members and leaders.

   c.  **For Doe 3**: Doe 3 directly told Defendant's Board Members and leaders.

280.  At all relevant times, Defendant knew or should have known that Norlha was using its facilities to prey upon and sexually abuse women.

281.   At all relevant times, Defendant knew or should have known that by subjecting Plaintiffs to sexual abuse, Norlha was also subjecting them to possible Hepatitis B and the possible life-ending consequences of that disease.

282.   **Breach**.  At all relevant times, Defendant provided Norlha with facilities so that he could gain access to, groom, isolate, and sexually abuse women.

283.   At all relevant times, Defendant provided Norlha with, or arranged Norlha to be provided with, women including Plaintiffs knowing that he would groom, isolate, and sexually abuse them.

284.   Defendant created an environment in which the sexual assault of women including Plaintiffs by Norlha was permitted, accepted, institutionalized, and encouraged.

285.   At all relevant times, Defendant, through its employees, agents, managers, and/or Board Members, facilitated and covered up Norlha's serial sexual abuse of women.

286.   Even though Defendant knew or should have known that Norlha was using its facilities and employees to gain access to, groom, sexually assault, and cover up the sexual assault of Plaintiffs, Defendant did nothing to address, prevent, or discourage Norlha's sexual assault of women and its failure to act implicitly permitted, approved, encouraged, and ratified such sexual assaults.

287.   Even though Defendant knew or should have known that Norlha was using the authority or apparent authority bestowed upon him by Defendant to gain access to, groom, sexually assault, and cover up the sexual assault of women, Defendant did nothing to address, prevent, or discourage Norlha's sexual assault of women and its failure to act implicitly permitted, approved, encouraged, and ratified such sexual assaults.

288.   Even though Defendant knew or should have known of Norlha's propensity toward, history of, and ongoing serial sexual assault of women, Defendant did nothing to address, prevent, or discourage Norlha's sexual assault of women.  Defendant also acted in a manner that implicitly permitted, approved, encouraged, and ratified such sexual assaults.

289.   Even though it knew of Norlha's Hepatitis B and its possible sexual transmission, Defendant did nothing to prevent or discourage Norlha's sexual assault of women in a manner that would prevent them from contracting Hepatitis B.

290.   In addition to failing to act, Defendant often acted in a way that expressly encouraged, facilitated, and enabled Norlha's continued sexual abuse of Plaintiffs.

291.   At all relevant times, Defendant and/or its agents, servants, and/or employees caused, created, or, despite actual, constructive, and/or imputed notice, permitted the existence of a dangerous condition to exist within its premises, including, but not limited to, the Retreat Center.

292.   At all relevant times, Defendant breached the above-stated duties in a negligent, reckless, willful, and wanton manner, and caused Plaintiffs to be sexually abused.

293.   **Damages**. As a result of Defendant's negligence, Plaintiffs suffered serious personal injuries, emotional distress, mental pain and suffering, mental anguish, and/or physical manifestations thereof, and other losses, all of which have not as of yet been ascertained.

294.   By reason of the foregoing, Plaintiffs are entitled to compensatory damages from Defendant in such sums as a jury would find fair, just, and adequate.

295.   The conduct described herein by Defendant was willful, wanton, and malicious.  At all relevant times, Defendant acted with conscious disregard of Plaintiffs' rights, feelings, and

well-being, and acted with the knowledge of or reckless disregard to the fact that its conduct was certain to cause injury and/or humiliation to Plaintiffs.

296.  By reason of the foregoing, Plaintiffs are entitled to punitive damages from Defendant in such sums as a jury would find fair, just, and adequate.

297.  This action falls within exceptions to Article 16 of the CPLR.

## COUNT V

## NEGLIGENT RETENTION AND SUPERVISION
### (New York state common law)

### *All Plaintiffs Against Defendant*

298.  Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

299.  At all relevant times, Defendant owed a duty to Plaintiffs to use reasonable care in the retention and supervision of Norlha as employee, agent, and servant, particularly given that he had access to young and vulnerable people living on its premises.

300.  At all relevant times, Defendant owed a duty of care to Plaintiffs to supervise its employees, agents, and servants, and to ensure that its employees were not using the authority bestowed on them by the Defendant to sexually assault or facilitate the sexual assault of women.

301.  At all relevant times, Defendant owed a duty to Plaintiffs because it placed Norlha in a position to cause foreseeable harm that would most probably have been spared had Defendant taken reasonable care in making decisions with respect to the hiring and retention of Norlha.

302.  At all relevant times, Defendant and Norlha were in an employer-employee relationship, with Norlha acting as its director and as a teacher.

303.   At all relevant times, Defendant's employees, agents, managers, and Board Members knew or should have known about Norlha's propensity to mistreat and sexually abuse women, and that he was a danger to women.

304.   At all relevant times, Defendant's employees, agents, managers, and Board Members knew or should have known that Norlha would use the power bestowed upon him by Defendant's to sexually assault Plaintiffs on Defendant's premises.

305.   Further, Norlha was the head of Defendant and its highest-ranking authority figure. His decisions and actions as the head of Defendant were binding as an agent and representative of Defendant.  At all relevant times, notice is imputed to Defendant by virtue of Norlha's position and authority.

306.   Defendant breached its duty of care to Plaintiffs by, *inter alia*, failing to supervise Norlha, terminate Norlha, remove Norlha from a position of authority, or take steps to otherwise reduce the risk that Norlha would use his position of power within Defendant's organization to sexually assault Plaintiffs.

307.   At all relevant times, Defendant and/or its agents failed to have, enact, and/or enforce rules, regulations, policies or procedures regarding sexual abuse, assault, and/or harassment at its facilities.

308.   Defendant's conduct described herein resulted in Norlha's commission of sexual assaults against Plaintiffs.

309.   There is a causal nexus between Defendants conduct and Plaintiffs injury in that but for Defendant's negligence, Norlha would have been properly supervised and would not have had access to Plaintiffs and otherwise able to sexually assault them.

310.   There is a causal nexus between Defendant's conduct and Plaintiffs injury in that but for Defendant's negligence, Norlha would not have been retained and therefore would not have had the opportunity to sexually assaulted Plaintiffs.

311.   As a result of Defendant's negligent retention and supervision, Plaintiffs suffered serious personal injuries, emotional distress, mental pain and suffering, mental anguish, and/or physical manifestations thereof, and other losses, all of which have not as of yet been ascertained.

312.   The burden on Defendant to take steps to warn or otherwise reduce the risk of Norlha's sexual abuse was small, while the harm from his sexual abuse was great and resulted in extensive physical and mental injury to Plaintiffs.

313.   By reason of the foregoing, Plaintiffs are entitled to compensatory damages from Defendant in such sums as a jury would find fair, just, and adequate.

314.   The conduct described herein by Defendant was willful, wanton, and malicious.  At all relevant times, Defendant acted with conscious disregard of Plaintiffs' rights, feelings, and well-being, and acted with the knowledge of or reckless disregard to the fact that its conduct was certain to cause injury and/or humiliation to Plaintiffs and other similarly situated students and employees.

315.   By reason of the foregoing, Plaintiffs are entitled to punitive damages from Defendant in such sums as a jury would find fair, just, and adequate.

316.   This action falls within exceptions to Article 16 of the CPLR.

## COUNT VI

## BREACH OF FIDUCIARY DUTY
**(New York state common law)**

### *All Plaintiffs Against Defendant*

317.   Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

318.   At all relevant times, Norlha and each of the Plaintiffs were in a formal secular counseling relationship.

319.   At all relevant times, each Plaintiff's relationship with Norlha became one of de facto control and dominance.  He managed their every life move, telling them whom to associate with, where to live, and what to do.  This conduct made Norlha a fiduciary beyond that of an ordinary counselor.

320.   At all relevant times, each of the Plaintiffs placed a high level of confidence and reliance in Norlha, who Defendant's leaders portrayed as an all-knowing, all-powerful person.

321.   At all relevant times, each of the Plaintiffs was highly vulnerable and incapable of self-protection.   Norlha and Defendant made them emotionally, mentally, physically, and financially dependent on Norlha and Defendant on Defendant's grounds.  They were so vulnerable as to surrender their will and capacity to determine their own best interests.  This is especially true while Plaintiffs were in the Three-Year Retreat, completely cut off from the outside world.

322.   At all relevant times, Norlha and each of the Plaintiffs were in relationships of trust and confidence.

323.   At all relevant times, Norlha had a duty to act honestly when advising Plaintiffs on how to lead their lives.   This was in the scope of the relationship that was created between Norlha and each of the Plaintiffs.

324.   At all relevant times, Norlha owed Plaintiffs a fiduciary duty.

325.   At all times, Defendant knew that Norlha owed Plaintiffs a fiduciary duty.   For example, Defendant's Board Members and leaders constantly encouraged Plaintiffs to let Norlha's judgment supplant their own, and watched it happen.

326.   Norlha knowingly breached his fiduciary duty to each of the Plaintiffs by taking advantage of their relationship of trust and confidence and forcing them to participate in sexual activity with him under the guise of it being for their benefit.   His intent was deceitful.

327.   At all relevant times, Defendant knowingly induced and/or participated in the breach.   Defendant did this by, *inter alia*, its leaders and Board Members physically retrieving Plaintiffs to see Norlha alone and/or facilitating Norlha being with Plaintiffs in private, knowing that Norlha was going to force them to endure sexual abuse.   Defendants also did this by failing to act after its Board Members and officials knew about Norlha's propensity for sexual predation as well as his actual sexual abuse.

328.   As a result of Norlha's breach, which Defendant aided and abetted, Plaintiffs suffered serious personal injuries, emotional distress, mental pain and suffering, mental anguish, and/or physical manifestations thereof, and other losses, all of which have not yet been ascertained.

329.   By reason of the foregoing, Plaintiffs are entitled to compensatory damages from Defendant in such sums as a jury would find fair, just, and adequate.

330.  By reason of the foregoing, Plaintiffs are also entitled to punitive damages from Defendant in such sums as a jury would find fair, just, and adequate.

331.  This action falls within exceptions to Article 16 of the CPLR.

## DEMAND FOR JURY TRIAL

332.  Plaintiffs respectfully hereby demands a trial by jury as to all matters so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court:

(a)  Damages in amounts to be established at trial, including without limitation, damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish and physical injuries, compensation for harm to reputation, loss of past, present and future enjoyment of life, and past and future lost earnings and earning capacity, and out-of-pocket expenses, punitive damages and liquidated damages;

(b)  Attorney's fees, costs and expenses authorized by 18 U.S.C. § 1595;

(c)  Pre- and post-judgment interest; and

(d)  Such other and further relief as the Court may deem just and proper.

*   *   *

Dated: November 17, 2023

Respectfully submitted,

BY: _____

John F.O. McAllister
Pamela Takefman
Carol Merchasin – *pro hac vice forthcoming*
McALLISTER OLIVARIUS
641 Lexington Avenue, 13th Floor
New York, New York 10022
(212) 433-3456
jmcallister@mcolaw.com
ptakefman@mcolaw.com
cmerchasin@mcolaw.com
*Attorneys for Plaintiffs*